# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **CONNOR CROWELL, on behalf of himself and all similarly situated employees,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:21-cv-00517** |
| | ) | **Judge Aleta A. Trauger** |
| **M STREET ENTERTAINMENT, LLC** *et al.*, | ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM

Before the court are (1) the plaintiffs' Motion for Partial Summary Judgment (Doc. No. 203) and (2) the defendants' Motion for Partial Summary Judgment (Doc. No. 208). To the extent possible, the court has considered the motions separately. As set forth below, both motions will be granted in part and denied in part.

## I.    BACKGROUND AND ISSUES

Plaintiff Connor Crowley filed this collective action on July 7, 2021, on his own behalf and that of a collective of similarly situated employees (collectively referred to herein as "plaintiffs"), asserting claims under the Fair Labor Standards Act ("FLSA") and seeking to recover unpaid minimum wages and overtime. (Doc. No. 1.) With the court's leave, the plaintiffs recently filed the First Amended Collective Action Complaint ("FAC"), adding two new defendants: Chris Hyndman and MSEG, LLC. (Doc. No. 283.)[1] The FAC is now the operative pleading. In the FAC,

---

[1] The plaintiffs' Motion for Leave to File First Amended Collective Action Complaint was filed before the parties filed their Motions for Partial Summary Judgment and was not granted until

the plaintiffs allege that the defendants collectively operate six restaurants in Nashville and collectively employ the plaintiffs as a single employer. In March 2021, this court conditionally certified a collective action comprised of "all current and former front-of-house employees who worked for the defendants at the Nashville, Tennessee restaurants Kayne Prime, Moto, Saint Añejo, Tavern Midtown, Virago, or Whiskey Kitchen in a non-managerial position" during the relevant time period. (Doc. No. 96.)

Most of the plaintiffs were, for at least some period of time, paid a cash hourly wage lower than $7.25 under the tip-credit provisions of the FLSA. Their FLSA claims are premised on allegations that the defendants: (1) failed to satisfy the requirements for utilizing the tip credit provisions of the FLSA to meet their minimum wage and overtime obligations, as a result of which the defendants are disqualified from claiming a tip credit; (2) required the plaintiffs to work off the clock by requiring them to study for menu tests and attend meetings; (3) required the plaintiffs to pay out of pocket for "tools of the trade," including uniforms and equipment; (4) required tipped employees to spend more than 20% of each shift on non-tip-producing work while paying them less than the required minimum wage of $7.25 for the time spent doing that work; and (5) improperly calculated overtime pay. (FAC ¶¶ 3, 5, 82.) The plaintiffs also allege that the defendants' noncompliance with the FLSA was "willful" and that, as a result, the plaintiffs are entitled to the benefit of a three-year statute of limitations, as set forth in 29 U.S.C. § 255(a). (FAC ¶¶ 146–47, 155–56.)

The plaintiffs seek summary judgment on a number of discrete issues, but not on all of their claims. They seek judgment that:

---

after the summary judgment motions had been filed. Defendants Hyndman and MSEG, LLC, therefore, technically did not join in the filing of the defendants' motion.

(1) Chris Hyndman and MESG, LLC are both "employers" of the plaintiffs for purposes of their FLSA claims and, with the already named defendants, form a single employer under the FLSA;

(2) the defendants violate (or violated) the FLSA's tip-credit provision by not providing adequate notice to the plaintiffs of their intent to take a tip credit, by exerting improper control over the plaintiffs' tips, and by not permitting the plaintiffs to retain all of their tips;

(3) the defendants violate (or violated) the FLSA's overtime provisions and tip-credit provisions by failing to pay overtime compensation to the plaintiffs at the proper rate, which, the plaintiffs claim, also resulted in the defendants' claiming a greater tip credit than permitted by the FLSA;

(4) time the plaintiffs spent studying or preparing for menu tests or other tests related to their employment is compensable under the FLSA; and

(5) the plaintiffs are entitled to liquidated damages under the FLSA.

(*See* Doc. No. 204, at 1–2.) The defendants oppose summary judgment on all of these issues, except, as discussed below, the question of liquidated damages. They have filed a Response in opposition to the plaintiffs' motion (Doc. No. 246), a Response to the plaintiffs' Statement of Undisputed Material Facts ("plaintiffs' SUMF") (Doc. No. 247), their own Statement of Additional Material Facts ("defendants' SAMF") (Doc. No. 248), and a vast quantity of evidentiary material. The plaintiffs filed a Response to the defendants' SAMF (Doc. No. 263), a Reply to the defendants' Response to the plaintiffs' SUMF (Doc. No. 262), a Reply brief (Doc. No. 261), and their own evidentiary materials.

The defendants also seek summary judgment on a few discrete issues, including that:

(1) the defendants paid the plaintiffs above minimum wage from May 2020 through April 2021 and did not take a tip credit during that time period, so the plaintiffs' claims relating to the tip credit during this time fail as a matter of law;

(2) the claims of any plaintiffs who were only employed for a few weeks and were never paid less than the minimum wage should be dismissed altogether;

(3) the defendants never included non-tipped employees in the tip pool distributions at any of the restaurants;

(4) the defendants did not unlawfully retain any portion of the gratuity included as part of customers' bills for large parties and private events;

(5) any FLSA violation by the defendants was not willful.

(*See* Doc. No. 214, *passim*.) The plaintiffs filed a Response opposing the motion (Doc. No. 242) and a Response to the defendants' Statement of Undisputed Material Facts ("defendants SUMF") plus a Statement of Additional Facts (the "plaintiffs' SAMF") (Doc. No. 243). The defendants filed a Response to the plaintiffs' SAMF (Doc. No. 266) and a Reply (Doc. No. 265). More evidentiary materials were filed in support of and in opposition to the defendants' motion.

In their Response to the defendants' motion, the plaintiffs concede that the defendants paid more than the minimum wage and did not take a tip credit from May 2020 through April 2021, but they otherwise maintain that the defendants are not entitled to summary judgment on the identified issues. (Doc. No. 242.)[2]

## II.    RULE 56 STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion

---

[2] The court construes the defendants' Motion for Partial Summary Judgment as seeking judgment on the identified discrete issues and on the question of willfulness. The plaintiffs do as well, but, "out of an abundance of caution" (Doc. No. 242, at 25), raise facts and arguments addressed to the defendants' liability on their FLSA claims (*see id.* at 25–30). The court will largely disregard these arguments as superfluous.

for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party to the litigation has filed a summary judgment motion. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Liquidated Damages

In their Response to the Plaintiffs' Statement of Undisputed Material Facts, the defendants concede that they have stipulated that they have withdrawn the affirmative defense of good faith against the plaintiffs' claim for liquidated damages under the FLSA, asserted in their Answer, and that they will not rely on a defense of good faith.

Under the FLSA, successful claimants are entitled to "the payment of wages lost" as a result of the FLSA violations, plus "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A court "in its sound discretion" may reduce the amount of liquidated damages only if an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of [FLSA]." 29 U.S.C. § 260; *see also* 29 C.F.R. 790.22(b); *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790, 815 (M.D. Tenn. 2008).

Here, the defendants have stipulated that they are "are withdrawing their good faith affirmative defense . . . and that [they] will not rely on this defense moving forward." (Doc. No. 179.) The court finds, therefore, that, if the plaintiffs prevail on any part of their claims, they will be entitled to liquidated damages in an amount equal to their lost wages, whether unpaid minimum wages, unpaid overtime compensation, and/or "the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer." 29 U.S.C. § 216(b). The plaintiffs are entitled to summary judgment on that issue, without further discussion.

### B. Whether Hyndman and MSEG are "Employers" Under the FLSA

#### 1. Facts

Defendants M Street Entertainment, LLC; Kayne Prime, LLC; Moto, LLC; 1120, LLC;

Lime, LLC; Virago, LLC, and WK, LLC (the "original defendants") collectively own and operate six restaurants in Nashville: Kayne Prime, Moto, Saint Añejo, Virago, Tavern, and Whiskey Kitchen (the "restaurants" or "M Street restaurants"). These defendants have stipulated that they constitute a single, integrated enterprise and a single employer for purposes of liability under the FLSA.[3] The court having now granted the plaintiffs' Motion to Amend Complaint, the plaintiffs have filed a First Amended Collective Action Complaint adding Chris Hyndman and MSEG, LLC ("MSEG" or "M Street Entertainment Group") as defendants.

Defendant M Street Entertainment, LLC ("M Street Entertainment") operates four of the six M Street restaurants: Kayne Prime, Virago, Tavern, and Whiskey Kitchen. (Doc. No. 285-1, Hyndman Dep. 7.[4]) Defendant 1120, LLC ("1120") operates Moto and Saint Añejo. (*Id.*) Hyndman is the sole and founding partner, CEO, and owner of MSEG. MSEG is the management company contracted by defendants M Street Entertainment and 1120 "to oversee [their] day-to-day operations." (*Id.*)

In Hyndman's deposition,[5] the parties refer to M Street Entertainment and 1120 and the restaurants they operate as the "M Street concepts" and "M Street entities" (*see, e.g.*, Hyndman Dep. 17 (identifying Virago as the "first" "M Street concept"), 31 ("M Street entity"); 35 ("the M Street companies"), 37 ("any M Street entity"), 40 ("M Street entities")), but without actually

---

[3] The facts for which no citation is provided are generally derived from the original defendants' Responses to the Plaintiffs' Statement of Undisputed Material Facts (Doc. No. 247) or the plaintiffs' Response to the Defendants' Statement of Additional Material Facts (Doc. No. 263) and are undisputed for purposes of the plaintiffs' Motion for Partial Summary Judgment.

[4] For all deposition transcripts in the record, if the original pagination is inconsistent with the pagination assigned by the court's electronic docketing system, the court uses the original transcript pagination.

[5] The court notes its disapproval of the defendants' confusing and inefficient practice of referring to exhibits, including declarations and deposition transcripts, by exhibit number ("Ex. A," "Ex. C"), rather than by the declarant's or deponent's name.

defining the term. Hyndman testified, somewhat ambiguously, that he was the "active partner, managing partner" of "these various M Street entities." (*Id.* at 39.) He explained that he does not really work for any company, but he owns MSEG and "perform[s] duties as the president" of M Street Entertainment, 1120, and "every other" M Street entity. (*Id.* at 40, 52, 58.)[6] He is also the only active member of M Street Entertainment and 1120. (*Id.* at 61–62.)

Hyndman explained that each restaurant is owned by a separate limited liability company; for instance, Kayne Prime, LLC is "just the entity" that owns Kayne Prime, the restaurant, but M Street Entertainment operates Kayne Prime. (*Id.* at 40.) The restaurant's employees are employed by Kayne Prime, LLC, "which is part of M Street Entertainment." (*Id.* at 41.) More specifically, M Street Entertainment owns 100% of Kayne Prime, LLC. (*Id.* at 42.) Hyndman owns 50% of M Street Entertainment. (*Id.* at 42–43.) In addition to Kayne Prime, LLC, M Street Entertainment owns and operates the limited liability companies (Virago, LLC, WK, LLC, and Lime, LLC) that respectively own the "restaurant concepts" Virago, Whiskey Kitchen, and Tavern.[7] According to Hyndman, M Street Entertainment, although it theoretically "operates" the restaurants, has no direct employees. (*Id.* at 58.)

Other individuals have refuted that statement. "People Operations Manager" (or human resources manager) Katie Kalmes, for instance, testified that, until recently, she was employed by, and received paychecks from, all six of the restaurant entities (one-sixth of her pay from each) for any given pay period, but, as of September 2022, she receives a single paycheck from "M Street Entertainment." (Doc. No. 287-6, Kalmes Dep. 10–11.) Carrie Doyle also testified that she is

---

[6] Hyndman appears to use the term "operating company LLCs" to mean all of the individual LLCs that own the restaurants. (*See* Hyndman Dep. 40, 58 (confirming that he is president of Moto, LLC).)

[7] Whiskey Kitchen is now permanently closed, the building in which it was housed having been sold, and Tavern is temporarily closed. (Hyndman Dep. 7–8.)

employed by M Street Entertainment as Operations Support Manager. (Doc. No. 287-4, Doyle Dep. 6, 12.) Paige Christy testified that she works for M Street Entertainment as Talent Development Manager. (Doc. No. 287-1, at 9.) Although their references to "M Street Entertainment" are somewhat ambiguous, insofar as these witnesses did not clarify whether they were talking about M Street Entertainment, LLC or MSEG, LLC, it seems clear that M Street Entertainment did not directly employ any individuals until September 2022 at the earliest, and it performs all of its "operational" functions through MSEG.

1120 owns and operates the restaurants Moto (through Moto, LLC) and Saint Añejo. 1120 directly employs the people who work at Saint Añejo.[8] Moto, LLC employs the individuals who work at Moto. (*Id.* at 58.) Hyndman owns 37.5 percent of 1120.[9]

Hyndman testified that he is "actively involved in the operations" of M Street Entertainment and 1120. (Hyndman Dep. 61–62.) MSEG makes decisions for the operations "[a]t

---

[8] The defendants now maintain that 1120, LLC owns Saint Añejo, LLC and that Saint Añejo, LLC owns Saint Añejo restaurant and employs the plaintiffs who work at Saint Añejo restaurant. (*See* Defs.' Resp. SUF ¶ 7 (citing Hyndman Dep. 58, 62.) The plaintiffs point out that Hyndman never actually identifies an entity named Saint Añejo, LLC during his deposition, though he seems to believe that some such entity employs the restaurant's employees. (*See* Hyndman Dep. 58.) The plaintiffs assert that there is no Saint Añejo, LLC registered to do business in Tennessee and that, prior to the filing of the Response to the Plaintiffs' SUMF, no entity named Saint Añejo, LLC had ever been identified in this litigation. The plaintiffs have also produced pay stubs received by plaintiffs who were employed by Saint Añejo that appear to have been issued by 1120, LLC. (*See, e.g.*, Doc. No. 205-8, at 12; Doc. No. 205-10, at 3; Doc. No. 205-11, at 1.) The court further observes that Katie Kalmes, human resources manager for all of the M Street entities, identified the "six concepts" from which she originally received her paychecks as "WK, LLC; 1120, LLC; Virago, LLC; Moto, LLC; and Kayne Prime, LLC; and Lime, LLC," thus also suggesting by deduction that 1120, LLC operated Saint Añejo. (*See* Kalmes Dep. 10, 11, 12.) In any event, this does not appear to be a material factual dispute, if it is indeed a factual dispute, in light of the stipulation that all of the original defendants constitute a single employer for purposes of the plaintiffs' FLSA claims.

[9] Hyndman explained that he owns 25 percent of 1120 directly, and another 12.5 percent of the company through his 50-percent ownership of M Street Entertainment, which owns 25 percent of 1120. (Hyndman Dep. 58.)

the executive level," including the hiring of managers, the setting of pay policies, operating hours, and the "hiring and firing of employees other than managers." (*Id.* at 62–63.) Human resources functions, according to Hyndman, are carried out through Katie Kalmes, who reports to Debra Johnson, who reports to Hyndman. Hyndman would have the authority to fire Kalmes or "anyone" who works at "any of these entities." (*Id.* at 63–64.) However, he has delegated the responsibility to hire and fire employees to Debra Johnson. (*Id.* at 64.) All MSEG employees and restaurant management-level employees report directly or indirectly to Debra Johnson, who reports to Hyndman, so "ultimately everyone reports to [him]." (Hyndman Dep. 69.)

Hyndman testified that MSEG is the custodian of employment records for all of the restaurant employees. (*Id.* at 64–65.) Katie Kalmes testified that ADP, the company to which payroll was outsourced during the relevant time, maintained contact information for all employees of M Street (defined for purposes of her deposition to include the "entire operation," meaning all four still existing restaurants and the "corporate office as well"). (Kalmes Dep. 10, 12, 26–27.) Only individuals on the "people team" had access to the information maintained by ADP, through a web portal. (*Id.* at 27–29.) Kalmes also testified that, every time payroll was processed, she would "download the payroll register" and "statistical summary" and that these reports were saved indefinitely in a "payroll reports folder on Google Drive within a larger people team folder." (*Id.* at 29–32.)

Hyndman testified that MSEG employs the "executive team" and the "support team of the executive team." (Hyndman Dep. 45.) Specifically, MSEG employs Debra Johnson as Chief Operating Officer ("COO") for M Street Entertainment and 1120; it also employs Taylor Cooper as an administrative assistant and Mike Freeman, who does bookkeeping and accounting for MSEG. (*Id.* at 44–45.) Johnson reports to Hyndman. All of the management-level restaurant

employees who work directly for the original defendants, including Kalmes, report to Johnson and ultimately to Hyndman. Hyndman also testified that MSEG shares office space at a location on the same block as all but one of the restaurants with "the shared labor support for the restaurants," who are "employees of the restaurants." (*Id.* at 39, 65.) This includes the people who work for MSEG, including Hyndman, Johnson, Taylor, and Freeman, as well as Katie Kalmes, Carrie Doyle, Paige Christy, and "other individuals that provide operational support in regards to inventory and cost management." (*Id.* at 66.) Carrie Doyle, Operations Support Manager, testified that she handles scheduling for all of the employees of all of the M Street restaurants and also verifies the accuracy of their time punches. (Doyle Dep. 12, 14–15.) Christy "oversees the schedules, the topics, the requirements that are to be covered in training" for front-of-house ("FOH") employees at all of the M Street restaurants. (Doc. No. 287-1, Christy Dep. 20.)

After the crisis created by the COVID-19 pandemic eased, Hyndman was involved directly in leading focus group meetings with FOH employees, for the purpose of developing the compensation structure for tipped employees that went into effect in April 2021. (Doc. No. 285-2, Johnson 30(b)(6) Dep. 198–99; Hyndman Dep. 171–73.) The plaintiffs also point to training calendars produced by the defendants that show that Hyndman was involved directly in conducting training sessions with FOH employees, at least at Moto. (*See* Doc. Nos. 190-1 through 190-5.)

Virago was Hyndman's first restaurant, which he started in 2000. He was the founding partner and CEO of Virago and responsible for every aspect of its operation at the outset. M Street generally is "sort of [his] vision." (Hyndman Dep. 17.) With respect to all of the restaurant concepts, Hyndman is initially very involved with "most every aspect," but his "day-to-day role is decreased" over time as the restaurants evolve, and he "focus[es] on primarily growth and strategy and vision," as well as "innovations in those concepts at a high level" and new opportunities that

might come along. (*Id.* at 18.) Hyndman agreed that he is still a "full-time owner-operator" of the "various M Street entities." (*Id.* at 39.) He is in the restaurants approximately three times per week. (*Id.* at 52.) Typically he "just kind of bounce[s] around to each one to check in and see how everybody is doing and check with the guests . . . , just to oversee at a super high level of how we are performing." (*Id.*)

Katie Kalmes testified that Hyndman "[u]ltimately" "determines" what uniforms FOH employees wear. (Kalmes Dep. 216, 219.) The defendants dispute that assertion, citing Hyndman's testimony, but Hyndman testified vaguely that he did not recall whether he was involved in deciding what the uniforms would be at the various restaurants and then stated that he "may have seen a design or something and approved it, but [he] was not involved in the uniforms." (Hyndman Dep. 223.) He claims that Johnson, instead, would have been in charge of uniforms. (*Id.* at 223–24.) Hyndman created the content for the Wine and Spirits 101 class that all FOH employees take during training. (Kalmes Dep. 231–32.) According to Kalmes, Hyndman and Debra Johnson together are "ultimately in charge of all the decisions and whatever happens at M Street," but she also agreed that Johnson reports to Hyndman. (*Id.* at 13–14.) Hyndman agreed that, as CEO, he was "ultimately" responsible for the M Street entities' compliance with wage and hours laws, even though he delegated responsibility for "day-to-day and oversight of compliance" to Johnson. (Hyndman Dep. 107–08.)

### 2. *Hyndman's Individual Liability*

#### a) *Legal Standards*

The defendants argue that Hyndman is not the plaintiffs' "employer" within the meaning of the FLSA. The plaintiffs maintain that he is. "Whether a particular situation is an employment relationship is a question of law." *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994).

The FLSA defines the term "employer" to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).[10] The Sixth Circuit has recognized that this definition is "exceedingly broad and generally unhelpful." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (citations omitted). Generally, "[w]hether an employment relationship exists under a given set of circumstances is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes. Rather, it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment or something else." *Id.* (internal quotation marks and citations omitted). The Sixth Circuit has also recognized that "[t]o state that economic realities govern is no more helpful" than the FLSA definition. *Id.* at 522–23. Ultimately, "[t]he issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Id.* at 522 (citation omitted).

The Sixth Circuit has, nonetheless, provided some parameters. Acknowledging that "[t]he FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA," the court declared that "'[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'" *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973), and then quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). In *Agnew*, the First Circuit held that "corporate officers with a significant

---

[10] The statute defines "person" to include "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a).

ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of non-payment" were employers under the FLSA. *Agnew*, 712 F.2d at 1514.

In *Dole*, the individual defendant owned 100% of the stock of the corporate defendant and was the president of the corporation. The record established that individual defendant "determined the amount of employee salaries," even though "the actual details of computing hours were handled by a payroll bookkeeper." *Id.* at 966. In addition, a "general manager handled many of the day-to-day problems relating to operation of the corporation," while "managers of branch offices exercised control over hours worked by employees at the branch offices." *Id.* at 966. The court nonetheless held that the "economic realities" of the case established that the president was an "employer" under the FLSA and "chargeable with personal liability for [the company's] failure to comply with the FLSA." *Id.* He was "the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries." *Id.* The fact that he had delegated some responsibility for certain functions, including the handling of the day-to-day running of the corporation's operations, was not dispositive, because, "[t]o be classified as an employer, it is not required that a party have exclusive control of a corporation's day-to-day functions. The party need only have 'operational control of *significant aspects* of the corporation's day to day functions." *Id.* (quoting *Agnew*, 712 F.2d at 1514) (emphasis added in *Dole*).

In *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013), the Second Circuit—surveying opinions from various courts of appeal—provided further guidance on the issue of "operational control." The court began by noting that "'[m]ost circuits to confront this issue have

acknowledged—and plaintiffs do not dispute—that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA employer.'" *Id.* at 107 (collecting cases). The court concluded,

> [e]vidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate "employer" status. Instead, to be an "employer," an individual defendant must possess control over a company's actual "operations" in a manner that relates to a plaintiff's employment. It is appropriate . . . to require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation—even if this appears to establish a higher threshold for individual liability than for corporate "employer" status.

*Id.* at 109 (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999)). In short, "[a] person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* at 110. This "does not mean that the individual 'employer' must be responsible for managing plaintiff employees—or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules." *Id.* However, "the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation." *Id.*; *accord Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) (relevant factors to be considered include whether the defendant exercises "substantial control of the terms and conditions of the work" of the plaintiff, has "authority to hire or fire the plaintiff," and "maintains the plaintiff's employment records and establishes the rate and method of payment"); *Dep't of Labor v. Cole Enters.*, 62 F.3d 775, 778 (6th Cir. 1995) ("[A] corporate officer who . . . is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for the purposes of FLSA." (citing *Fegley*, 19 F.3d at 1131)).

   *b)*    *Application to the Facts*

  The court finds as a matter of law that Hyndman qualifies as the plaintiffs' "employer" under the FLSA, based on the specific circumstances presented here. First, there is no dispute that Hyndman owns a "significant ownership interest" in all of the relevant companies. *Agnew*, 712 F.2d at 1514. He owns and operates MSEG outright. While MSEG does not have an ownership interest in the other M Street entities, Hyndman owns 50 percent of M Street Entertainment, and, through that portion, also owns 50 percent of the LLCs that own and operate the restaurants Kayne Prime, Virago, Whiskey Kitchen, and Tavern. He owns 37.5 percent of 1120, which owns and operates Moto and Saint Añejo.

  Hyndman also has "operational control of significant aspects of the corporation's day to day functions." *Id.* He is the CEO of MSEG and is the functioning president and only active member of M Street Entertainment and 1120 and "every other" M Street entity. (Hyndman Dep. 40, 52, 58.) Although he has clearly delegated most of the business of running the restaurants on a day-to-day basis to COO Debra Johnson, who, in turn, has delegated human resources functions to Katie Kalmes as the People Operations Manager, all MSEG employees and restaurant management-level employees report directly or indirectly to Debra Johnson, who reports to Hyndman, so "ultimately everyone reports to [him]." (Hyndman Dep. 69.) While he is not involved in the minutiae of management, he was very involved in setting up the systems that are in place in each restaurant, specifically including the setting of compensation and other employment policies for the restaurants, and he remains involved in training FOH employees. Together with his COO, Hyndman is "ultimately in charge of all the decisions and whatever happens at M Street." (Kalmes Dep. 13–14.) Hyndman himself agreed that he is "ultimately," though indirectly, responsible for the M Street entities' compliance with wage and hours laws. (Hyndman Dep. 107–08.)

The plaintiffs' Motion for Partial Summary Judgment as to Hyndman's personal liability for alleged violations of the FLSA, therefore, will be granted.

### 3.    MSEG's Liability

#### a)    Legal Standards

Beyond emphasizing that the inquiry is controlled by "economic reality" rather than "common law concepts of agency," *Dole*, 942 F.2d at 965, the Sixth Circuit "has not adopted a specific test for determining when it is appropriate under the FLSA to charge multiple business entities with liability as the employers of a single individual." *Martin v. Lincor Eatery, Inc.*, 423 F. Supp. 3d 432, 438 (E.D. Mich. 2019) (citing *Sutton v. Cmty. Health Sys., Inc.*, No. 16-01318, 2017 WL 3611757, at *3 (W.D. Tenn. Aug. 22, 2017)). In the employment discrimination context, however, the Sixth Circuit has looked to the "single employer" (or "integrated enterprise") and "joint employer" doctrines developed under labor relations law, *see Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 & n.3 (6th Cir. 1997), and, although the Sixth Circuit has yet to do so, district courts within the Sixth Circuit have applied these doctrines in the FLSA context to determine whether a particular entity qualifies as a plaintiff's "employer." *See, e.g.*, *Lee v. S&E Flag Cars, LLC*, No. 2:14-CV-176 (WOB), 2022 WL 56522, at *3 (E.D. Ky. Jan. 5, 2022); *Martin*, 423 F. Supp. 3d at 438–44; *Perkins v. Am. Spotting Co. of Ohio, Inc.*, No. 2:18-CV-54, 2018 WL 7358598, at *2 (S.D. Ohio Dec. 13, 2018); *Smith v. The Cheesecake Factory Rests., Inc.*, No. 3:06-829, 2010 WL 441562, at *11–12 (M.D. Tenn. Feb. 4, 2010) (Haynes, J.). Only the "single employer" or "integrated enterprise" doctrine is at issue in this case.

Under that doctrine, "two [or more] companies may be considered so interrelated that they constitute a single employer subject to liability under" federal law. *Swallows*, 128 F.3d at 993. "In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, *i.e.*, common offices, common record keeping, shared bank

accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Id.* at 993–94. "None of these factors is conclusive, and all four need not be met in every case. Nevertheless, control over labor relations is a central concern." *Id.* at 994 (internal citation omitted).

b)      *Application to the Facts*

The interrelation of operations is the first factor. Interrelation of operations may be indicated, for instance, by common offices, common recordkeeping, and shared bank accounts and assets. *See id.* It is undisputed that MSEG does not share a bank account with any of the other defendants (Doc. No. 263 ¶ 18), and the court has not been presented with evidence of a general disregard for corporate formalities. However, MSEG employees share office space with Katie Kalmes, Carrie Doyle, and Paige Christy, all of whom are employed by M Street Entertainment but perform jobs related to the employment of FOH employees, including the plaintiffs, at all of the M Street restaurants—human resources, scheduling, and training. In addition, although Kalmes testified that ADP, M Street's former payroll processing company, at all relevant times maintained the contact and payroll data for all M Street employees and that only individuals on the "people team" had access to that information through a web portal (Kalmes Dep. 27–29), Hyndman testified that MSEG was technically the custodian of employment records for all of the restaurant employees. (Hyndman Dep. 64–65.) This interrelation of functions supports a finding of common offices and common recordkeeping among all of the entities.

The facts also indicate common management. Hyndman is CEO of MSEG and functions as president of all of the other entities. Johnson is COO of MSEG, but the management employees of M Street Entertainment and the restaurant LLCs report directly to her, while she reports to Hyndman. Hyndman also testified that he is the only active member of all of the various M Street

LLCs.

As for centralized control of labor relations and personnel, this factor— arguably the most important—concerns the power to hire and fire employees. *See Swallows*, 128 F.3d at 995 (finding this factor not satisfied where only the direct employer had the power to hire and fire). In this case, while it appears that the individual LLCs that operate the restaurants directly hire the FOH employees who work for them, there is no dispute that Debra Johnson, MSEG's COO, has the authority to hire and fire restaurant employees, an authority delegated to her by Hyndman. (*See* Hyndman Dep. 65 ("Obviously, there are other folks that are part of that process, but [Johnson] oversees that process and makes sure that any termination is in compliance with employment law.").) In other words, MSEG has the ultimate authority to hire and fire all M Street entity employees.

As for common ownership and financial control, while this factor weighs strongly in favor of finding that Hyndman is an "employer" under the FLSA, as discussed above, it does not weigh strongly toward further implicating MSEG, because, even though Hyndman has a finger in every pot, MSEG itself has no ownership interest in M Street Entertainment, 1120, or the restaurant LLCs.

Considered in their totality, however, the relevant factors establish that MSEG and the other entity defendants, and particularly M Street Entertainment, are "so interrelated that they constitute a single employer subject to liability under" the FLSA. *Swallows*, 128 F.3d at 993. MSEG and M Street Entertainment share common office space, interrelated management, and centralized control of labor relations and personnel. As the plaintiffs argue, "MSEG ultimately makes all decisions about [the] Restaurants' operations, including business operations and employment policies and practices such as pay." (Doc. No. 204, at 12.) MSEG qualifies as the

plaintiffs' employer and may be jointly and severally liable with Hyndman and the original defendants for any FLSA violations established by the plaintiffs. The plaintiffs are entitled to summary judgment on this issue as well.

### C.     The FLSA's Tip-Credit Provision

The plaintiffs argue that the defendants violated the FLSA's tip-credit provision, because the defendants (1) did not provide adequate notice to the plaintiffs of their intent to take a tip credit under 29 U.S.C. § 203(m)(2) and 29 C.F.R. § 531.59(b), and (2) exerted improper control over the plaintiffs' tips, insofar as they did not permit the plaintiffs to retain all of their tips.

#### 1.     Legal Standards

The FLSA requires employers to pay employees a minimum wage—currently set at $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). The FLSA contains an exception that permits employers to pay "tipped employees" a "tip wage" of less than the minimum wage—no less than $2.13 per hour—when the tipped employees' tips make up the difference between the tip wage and the minimum wage. *Id.* § 203(m). The employer's discount is called the "tip credit." *See id.* § 203(m)(2)(B); *U.S. Dep't of Lab. v. Cole Enters.*, 62 F.3d 775, 780 (6th Cir. 1995).

To claim this discount, however, employers must comply strictly with several mandates. As relevant to the plaintiffs' motion, an employer must inform tipped employees of its use of the tip credit, including (1) the amount of the employee's cash wage, (2) the amount of the tip credit claimed by the employer, (3) that the amount claimed may not exceed the value of the tips actually received, (4) that all tips received must be retained by the employee, except that "the pooling of tips among employees who customarily and regularly receive tips" is permitted, and (5) that the tip credit shall not apply to any employee who has not been informed of all of these requirements. 29 U.S.C. § 203(m)(2); 29 C.F.R. § 531.59(b). Although the Sixth Circuit has yet to directly address this regulation, other courts have held that 29 C.F.R. § 531.59(b) is consistent with the

statutory text and is entitled to deference. *See, e.g.*, *Galleher v. Artisanal, LLC*, No. 1:19-cv-55-MOC-WCM, 2021 WL 243868, at *6 (W.D.N.C. Jan. 25, 2021) ("The proper standard of notice is set out in the U.S. Department of Labor's regulation interpreting Section 203(m)—29 C.F.R. § 531.59." (citing *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 801–02 (N.D. Ill. 2013))); *see also Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 54 (D.D.C. 2012) ("[S]ection [203(m)] . . . expressly requires employers to disclose the very provisions that are set out in the final rule."). At a minimum, "adequately informing an employee of the tip credit requires an employer to give notice of its intent to take a tip credit and the tip credit amount." *McFarlin v. Word Enters.*, No. 16-CV-12536, 2018 WL 1410827, at *2 (E.D. Mich. Mar. 21, 2018) (citing *Cole*, 62 F.3d at 780). If an employer fails to strictly comply with § 203(m)'s requirements, it "must be divested of its statutory tip credit for the relevant time period." *Steele v. Leasing Enters.*, 826 F.3d 237, 246 (5th Cir. 2016); *see Solis v. Min Fang Yang*, 345 F. App'x 35, 38 (6th Cir. 2009) ("At a minimum, the employer must provide notice to employees of its intent to take a tip credit. If an employer fails to provide such notice, the tip credit may not be claimed, regardless of whether employees suffered actual economic harm as a result." (citing *Kilgore v. Outback Steakhouse*, 160 F.3d 294, 298 (6th Cir. 1998); *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992)).

The burden is on the defendant to prove that it complied with § 203(m) and the implementing regulation, 29 C.F.R. § 531.59(b). *Perez v. Lorraine Enters.*, 769 F.3d 23, 27 (1st Cir. 2014) (citing *Barcellona v. Tiffany English Pub., Inc.*, 597 F.2d 464, 467–68 (5th Cir. 1979)). Thus, to defeat summary judgment on this issue, the defendants must "adduce definite, competent evidence" that they provided the notice required by the FLSA. *Id.* at 30.

### 2. Facts Pertaining to the Tip Credit

Three distinct time intervals are at issue with respect to the defendants' tipping policy: (1) the time period pre-dating the COVID-19 pandemic, up through March 2020 ("pre-pandemic

period"); (2) March 2020 through April 12, 2021, when the restaurants were either closed altogether (March 2020 through May 2020) or were open but the defendants paid a higher hourly wage to all employees and did not take a tip credit; and (3) April 12, 2021 to the present ("post-pandemic period"), during which the defendants have paid tip wages and claimed a tip credit with respect to all tipped employees. The plaintiffs do not seek summary judgment relating to the period during which the defendants did not claim a tip credit and "have offered to stipulate that they have no tip-credit damages during that period." (Doc. No. 204, at 19 n.10.)

Except during that limited time period, the defendants have paid captains, servers, server assistants, food runners, bartenders, and other tipped employees, including the plaintiffs, a regular (non-overtime) hourly wage less than minimum wage, typically (but not always) $2.13, while claiming a tip credit of up to $5.12 per hour, under 29 U.S.C. § 203(m)(2).

According to the plaintiffs, they requested in discovery that each of the defendant restaurants

> [i]dentify and describe in detail the rules, policies, practices, and procedures of Defendant concerning the tip credit and tip sharing during the relevant period— including dates on which any rules, policies, practices, or procedures were implemented or modified, the scope of any tip-sharing requirements or suggestions, who participates in any tip pooling or sharing, how the tip-out process works, and for whom the tip credit is or has been claimed.

(Doc. Nos. 145-20 through 145-24, Pls' Interrogs. ¶ 1.) In their Supplemental Responses to Plaintiffs' First Set of Interrogatories, the defendants answered as follows:

> Prior to March 2020, Defendant paid non-managerial [tipped] employees . . . an appropriate tip credit. . . . Beginning April 2021 to present, Defendants transitioned back to the utilization of the tip credit . . . . Each employee participating in the tip credit signs a tip-credit acknowledgment form.

(*Id.*, Defs.' Answers to Pls.' Interrogs. ¶ 1.) In their discovery answer, the defendants did not indicate when employees began signing tip-credit acknowledgment forms.

The plaintiffs also asked the defendants to "[i]dentify and describe in detail all communications with Plaintiffs concerning the tip credit, the tip-credit requirements, tips, cash out, tip out, tip pool, and/or tip share." (*Id.* ¶ 8.) The defendants answered this interrogatory by directing the plaintiffs to "[s]ee Supplemental Responses to Interrogatory No. 1," presumably cross-referencing the tip-credit acknowledgment forms. (*Id.*, Answers to ¶ 8.) It does not appear from the record that the defendants provided any additional information during discovery about their communications with the plaintiffs regarding tip credits or their compliance with § 203(m) and the implementing regulation.

The plaintiffs also point to the testimony of Carrie Doyle. Doyle is currently employed by M Street Entertainment as Operations Support Manager, a role she has held since 2020, prior to which she was a manager at Moto from approximately 2018 through the pandemic shutdown in March 2020; before that, she was a server at Kayne Prime. (Doyle Dep. 12–13, 18–19.) Doyle testified that, throughout her employment with M Street, she has never received any "training on wage and hour law," on "minimum wage and overtime," or on "tip credits," nor was she ever informed when she was a server "about how M Street was meeting its minimum wage obligations." (*Id.* at 172.) Doyle also stated that, while she was a manager at Moto, she never provided information to servers about how M Street was meeting its minimum wage obligations, and, to her knowledge, no one else at Moto or M Street advised servers "about any requirements of the Fair Labor Standard[s] Act with respect to using tips as part of the minimum wage" or "anything else about tips or the tip credit or the use of tips to meet the minimum wage." (*Id.* at 173, 174.) Instead, because she has "been in the industry for so long," she is aware that the minimum wage for tipped servers it $2.13 per hour, but that "is all [she] know[s]." (*Id.* at 173.)

Citing Katie Kalmes' deposition testimony, the plaintiffs assert—and the defendants do not dispute—that, during the post-pandemic period, the defendants relied on their written Compensation Structures and Tipped Employee Policy to attempt to comply with the FLSA's tip-credit notice requirements. (Doc. No. 247 ¶ 40.) Kalmes testified that, during this time, M Street implemented a policy of providing a packet of onboarding documents to new employees, including the Compensation Structures (with a different structure for each restaurant concept) and a Tipped Employee Policy. (Kalmes Dep. 14, 90–92; *see also* Doc. Nos. 250 (M Street Tipped Team Member Policy[11]), 251 (Compensation Structures).)

The Tipped Employee Policy states that, under the FLSA, employees who receive more than $30 per month are "tipped" employees. It further states that "[t]ips are the property of the employee" and cannot be used by the employer for any reason "other than as a credit against its minimum wage obligation to the employee ('tip credit') or in furtherance of a valid tip pool." (Doc. No. 250.) The Policy defines the terms "tip credit" and "tip pool" as follows:

Tip Credit: Section 3(m) of the FLSA permits an employer to take a tip credit toward its minimum wage obligation for tipped employees equal to the difference between the required cash wage (which must be at least $2.13) and the federal minimum wage. Thus, the maximum tip credit that an employer can currently claim under the FLSA . . . is $5.12 per hour (the minimum wage of $7.25 minus the minimum required cash wage of $2.13). . . .

Tip Pool: The requirement that an employee must retain all tips does not preclude a valid tip pool or sharing arrangement among employees who customarily and regularly receive tips, such as waiters, waitresses, . . . bussers, and service bartenders. A valid tip pool may not include employees who do not customarily and regularly receive tips, such as dishwashers, cooks, chefs, and janitors.

---

[11] The plaintiffs identify the document attached as Exhibit 9 to their Statement of Undisputed Material Facts as the Tipped Employee Policy. (*See* Doc. No. 205, SUMF ¶ 40.) It is clearly not M Street's Tipped Employee Policy. Rather, it is a Fact Sheet promulgated by the Wage and Hour Division of the United States Department of Labor pertaining to "Tipped Employees Under the Fair Labor Standards Act (FLSA)" (April 2018) (Doc No. 205-9.) The parties have not provided any evidence regarding the relevance of this document.

(Id.)

The Policy then states:

It is M Street Entertainment Group's policy to comply with federal and state laws regarding payment of wages and the tax reporting of tips and/or gratuities. Therefore, we have a mandatory tip sharing program in which non-management employees in the following job codes (captain, server, server assistant, food runner, barback, bartender) will receive a share of tips.

(*Id.*) The form Policy contains a line for employees to sign to acknowledge receipt of, and agreement with, this Policy. (*Id.*)

The Compensation Structures that went into effect during the Spring of 2021 (at various times, and updated at various intervals) identify, for each individual restaurant, the base pay rate for each category of tipped employee (for example, $2.13 for servers, server assistants, bartenders, and some server assistant food runners, $5.50 for some "bartender leads," and minimum wage or above minimum wage for some employees) and the precise tip share percentages to be pooled and shared by the servers and bartenders with the employees in the other identified job categories. (Doc. No. 251.)

There appears to be no dispute that the defendants did not provide these documents to tipped employees during the pre-pandemic time period. However, the defendants now claim that they "verbally informed tipped employees that Defendants utilized a tip[] credit and informed tipped employees of their tipped wage" and that they relied on "FLSA-approved posters in all Restaurant Concepts which included detailed information regarding the Defendants' use of the tip credit." (Doc. No. 247, Defs.' Resp. to Pls.' SUMF ¶ 37 (citing Doc. Nos. 145-20 through 145-25; Doc. No. 248-11, Sutton Decl. ¶ 5; Doc. No. 248-4, Johnson Decl. ¶¶ 3, 4[12]); *see also* Doc. No.

---

[12] The court presumes that this is the Johnson Declaration the defendants intended to cite—though they did not specifically identify which of the five Johnson Declarations in the record they intended to reference.

248, Defs.' SAMF ¶ 23.) Johnson avers in the cited Declaration that, beginning in January 2018, she personally ordered and oversaw "the placement of United States Department of Labor ('DOL') posters in the Restaurants" that detailed the DOL's requirements for complying with the FLSA. (Doc. No. 248-4, Johnson Decl. ¶ 3.) According to Johnson, the posters outline the minimum wage, overtime pay requirements, and the tipped employee minimum wage of $2.13 applicable when an employer "claims tip credit against the federal minimum wage of $7.25." (*Id.* ¶ 4.) Johnson also states that the posters are updated annually. (*Id.* ¶ 5; *see also* Doc. No. 248-7 (photographs of several such posters).)

As the close-up photographs produced by the defendants show, the current posters at each restaurant state in bold, large font that the federal minimum wage is $7.25. They contain the following language relevant to the FLSA:

> **TIP CREDIT** Employers of "Tipped Employees" who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference.

(*See, e.g.*, Doc. No. 248-7, at 3.) There is no information in the record regarding when the posters depicted in the photographs were posted and whether they differ from the posters that were displayed during the pre-pandemic period.

Jaime Sutton, currently the Senior General Manager of Saint Añejo, worked as Saint Añejo's manager from 2018 through early 2022. She states that, prior to the centralization of the onboarding process in 2020, managers at each restaurant verbally informed employees of their compensation structure (Doc. No. 248-11, Sutton Decl. ¶ 5.) Thus, for example, according to Sutton, "in 2019 at Saint Añejo, employees were informed that their rate of pay would be $2.13 per hour and that the remainder of their wage would be comprised of their tips" and that their tips

would be shared among bartenders and server assistants. (*Id.*) Based on her "experience and knowledge," the source of which she does not explain, Sutton asserts that this "practice of informing front of house employees of their tipped minimum wage, the tip credit, that all tips were to be retained by employees, and the fact that there was a mandatory tip pool . . . was consistent among all of the M Street restaurants." (*Id.* ¶ 6.)

### 3. Notice of Intent to Take a Tip Credit

#### a) Pre-Pandemic Time Period

29 C.F.R. § 531.59, implemented in 2011, provides that,

> [p]ursuant to section 3(m)(2)(A), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m)(2)(A) of the Act, *i.e.*: The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of the requirements in this section.

29 C.F.R. § 531.59(b). The defendants have the burden of proving their compliance with this provision in order to take the tip credit.

The plaintiffs contend that the defendants provided no notice under § 203(m) during the pre-pandemic period, as established by their discovery answers—in which they did not identify any communications regarding the tip credit—and by the testimony of Carrie Doyle and Paige Christy that they neither, as managers, provided information to servers about the tip credit nor, when they worked as servers, received information about it. Citing Jaime Sutton's Declaration, the defendants assert that, before adopting the formal tip policy in October 2020, managers at the individual restaurants "verbally notified its tipped employees of the tip credit requirements," specifically including that "their regular rate would be the tipped minimum wage, that tips would

bridge the gap between their hourly rate and the federal minimum wage, and that tips were exclusively for employees." (Doc. No. 246, at 12–13.) In addition, the defendants claim that the DOL minimum wage posters that were displayed in employee common areas at each restaurant "further explained the tip credit rule and informed tipped employees they would be paid the lower hourly rate of $2.13 and that tips would make up the difference between such rate and the federal minimum wage of $7.25." (*Id.* at 13.) The defendants argue that verbal communications, particularly in conjunction with written communications, may satisfy their obligation.

In their Reply, the plaintiffs assert that the generic language of the DOL poster does not include all of the information required by § 531.59(b) and that Sutton's testimony, even if creditable, likewise does not establish compliance with § 531.59(b). In addition, referencing Federal Rule of Civil Procedure 37(c)(1), the plaintiffs object to the defendants' claim that they "verbally notified" tipped employees of the tip credit requirements, on the basis that the defendants produced no facts to support that claim in their discovery responses. (Doc. No. 263 ¶ 23.)

Rule 37(c)(1) provides that, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e)," pertaining to initial disclosures and supplementing disclosures and discovery responses, "the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." The defendants here have made no effort to explain their failure to adequately disclose the means by which they purportedly conveyed tip credit information to employees, as required by § 203(m), prior to the implementation of the written tip-credit acknowledgment form in October 2020.

Even if the court permits the defendants to rely on the information in Sutton's and Johnson's Declarations, however, their testimony is not sufficient to create a material factual dispute as to whether the defendants provided the plaintiffs all of the information required by 29

U.S.C. § 203(m) and 29 C.F.R. § 531.59(b) during the pre-pandemic period. Sutton's testimony would not permit "a reasonable jury [to] return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018). She states vaguely only that, "prior to the centralization of the onboarding process" that took place in 2020, "managers informed employees of their compensation structure." (Doc. No. 248-11 ¶ 5.) For example, she says, in 2019, while she was a manager at Saint Añejo, managers informed employees that "their rate of pay would be $2.13 per hour and that the remainder of their wage would be comprised of their tips" and that "servers would tip out bartenders and server assistants." (Doc. No. 248-11 ¶ 5.) This information is effectively no different from the information that Doyle testified she was aware of just by virtue of long experience in the restaurant industry: that waiters were paid a cash wage of $2.13 per hour plus tips. It says nothing about the FLSA and its legal requirements.

Moreover, the information supposedly provided by Saint Añejo managers does not establish that the defendants, across the board, informed tipped employees (1) that the employer would be taking a tip credit, (2) the amount of the tip credit, or (3) that all tips had to be retained by the employees except the portion subject to tip pooling among employees who customarily and regularly receive tips. In addition, the plaintiffs have produced evidence that not all tipped employees received a wage of $2.13, but the defendants have produced no evidence regarding what was told to those employees regarding the tip credit.

Sutton also states, "[b]ased on [her] experience and knowledge," that "the practice of informing front of house employees of their tipped minimum wage, the tip credit, that all tips were to be retained by the employees, and the fact that there was a mandatory tip pool . . . was consistent among all of the M Street restaurants." (Sutton Decl. ¶ 6.) The problem here is that the previous paragraph of the Declaration, purporting to outline the information provided by Saint Añejo

managers, does not establish even that the Saint Añejo managers communicated all of that information, nor does Sutton justify her certainty regarding the practices at restaurants other than the one where she was employed. That is, she does not claim to have personally observed managers at other restaurants relay this information, nor have the defendants identified an expressly adopted policy or practice—even an unwritten one—requiring managers to provide this type of information to employees. Sutton's testimony, in sum, is too vague to permit a rational jury to conclude that the defendants complied with their obligations under § 203(m) through managers' verbal communications to employees.

The defendants, therefore, are left with only the DOL posters that Debra Johnson personally ensured were posted at each restaurant and updated annually. The posters in the record (identified on their face as the Wage and Hour Division's publication 1088, revised 07/16, suggesting they have not been updated since then) identify the federal minimum wage as $7.25 and refer generically to FLSA requirements that permit employers "who meet certain conditions" to claim a partial wage credit based on tips receive by their employees," that such employers "must pay tipped employees a minimum of $2.13 it they claim a tip credit against their minimum wage obligation," and that the employer must make up the difference if the cash wage plus tips is less than minimum wage. (Do. No. 248-7, at 3.) This document does not constitute the *defendants´* informing the plaintiffs that *they* specifically meet the referenced conditions and intended to take a tip credit against the minimum wage, nor does the poster provide the additional information required by § 203(m). Consequently, courts have "almost universally rejected the argument that such a generic government poster can satisfy the notice obligations under § 203(m)." *Galleher v. Artisanal, LLC*, No. 1:19-cv-55-MOC-WCM, 2021 WL 243868, at *8 (W.D.N.C. Jan. 25, 2021); *see also, e.g.*, *Prusin v. Canton's Pearls, LLC*, No. CV JKB-16-0605, 2017 WL 5126156, at *5

n.6 (D. Md. Nov. 6, 2017) ("[M]any courts have rejected arguments that language included on a DOL poster is alone sufficient to satisfy the FLSA's tip credit notice requirements."); *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 289 (S.D.N.Y. 2011) ("A generic government poster could inform employees that minimum wage obligations exist, but could not possibly inform employees that their employers intend to take the tip credit with respect to their salary."); *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 467 (S.D.N.Y. 2015) (same); *Driver*, 917 F. Supp. 2d at 803 (same). "As the USDOL observed in issuing 29 C.F.R. § 531.59(b), 'the FLSA poster (Publication 1088)' provides only a limited description of the tip credit rules and recognizes that 'other conditions must also be met'. . . ." *Driver*, 917 F. Supp. 2d at 802–03 (quoting 76 Fed. Reg. 18832, 18843, 2011 WL 1231289 (Apr. 5, 2011)).[13] More specifically, courts of appeal have uniformly "require[d] at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations." *Copantitla*, 788 F. Supp. at 287–88 (citing *Martin*, 969 F.2d at 1322; *Kilgore*, 160 F.3d at 298; *Reich*, 28 F.3d at 403).

Even considering Sutton's Declaration and the FLSA posters together, the evidence produced by the defendants—on an issue with respect to which they bear the burden of proof—is

---

[13] While some courts have concluded that the notice contained in the poster is sufficient, those opinions for the most part predate the 2011 implementation of 29 C.F.R. § 531.59. *See, e.g.*, *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310 (S.D. Fla. 2007) (finding that it would "defy logic to require the display of inadequate information regarding the minimum wage and employer tip credit" and therefore that "a prominently displayed poster using language approved by the Department of Labor to explain 29 U.S.C. § 203(m) is sufficient notice"). Moreover, although *Pellon* cited the Sixth Circuit's opinion in *Kilgore* in support of its conclusion that an employer's prominent display of the DOL poster may satisfy the notice requirements, in *Kilgore* it was undisputed that the employer provided the plaintiffs with a file folder containing a written tip policy that stated: "I understand that the practice of sharing tips among tipped employees is approved by Outback Steakhouse. Further, I understand that tips will be used as a credit against the minimum wage as permitted by federal and/or state law." *Kilgore*, 160 F.3d at 299. In addition, the written tip policy "also fully quoted 29 U.S.C. § 203(m)." *Id.* Thus, to the extent *Kilgore* can be read as suggesting that the DOL poster provided the requisite notice, any such suggestion was purely dictum.

not sufficient to persuade a rational jury that the defendants satisfied their notice obligations under § 203(m). The plaintiffs are entitled to summary judgment on this issue, meaning that the defendants may not take a tip credit for the pre-pandemic time period and will be liable to the plaintiffs in the amount of the difference between the tip wages the plaintiffs received and the minimum wage, plus liquidated damages.

### b) Post-Pandemic Time Period

Conversely, the plaintiffs have not established that the defendants failed to comply with their notice obligation post-pandemic. There is at least a material factual dispute as to whether the defendants displayed the DOL posters referenced above and as to whether they provided the plaintiffs with a written copy of the Tipped Employee Policy and the Compensation Structures during this time frame. Assuming so (which the plaintiffs do not dispute for purposes of their motion), the court finds the display of the posters, in conjunction with the distribution of the defendants' Tipped Employee Policy and Compensation Structures prior to the defendants' recommencement of tipping in late 2020 or early 2021, sufficient to satisfy their obligations under § 203(m).

The posters generically provide that an employer may take a tip credit. The Tipped Employee Policy expressly notified the plaintiffs who regularly received more than $30 per month in tips that they were classified as tipped employees, that the defendants intended to take a tip credit in the amount of the difference between the tip wage and the minimum wage, that the employer was prohibited from using an employee's tips for any reason other than as a credit against its minimum wage obligation "or in furtherance of a valid tip pool," and that employees were entitled to retain all tips except those subject to a valid tip pool among other tipped employees. (Doc. No. 250.) And the Compensation Structures further explicitly identified the wage for each job classification and the manner by which tips would be pooled and distributed.

The plaintiffs argue that the information provided is not sufficient, because the Tipped Employee Policy does not expressly state the amount of the tip credit the defendants will take for each employee and it does not state that an employer who does not comply with the tip-credit notice provisions is not entitled to take the tip credit. As to the first issue, the court finds that the statement that the employer will take a maximum tip credit of $5.12, as the difference between the minimum required cash wage of $2.13 and the minimum wage of $7.25, was sufficient to inform employees of the tip credit the defendants intended to take.

As to the second issue, the court is not aware of any case in which a court denied an employer a tip credit solely on the basis that the employer failed to notify employees that "the tip credit shall not apply to any employee who has not been informed of the requirements in this section," 29 C.F.R. § 531.59, where the employer has otherwise notified employees of the *substantive* aspects of the notice provision. Although, clearly, a better practice would be to precisely track the requirements set forth in 29 C.F.R. § 531.59(b), including by providing notice that such notice is required, the defendants here have created at least a material factual dispute at to whether they notified the plaintiffs of (1) the amount of the cash wage to be paid them; (2) the amount of the tip credit the defendants would claim; and (3) the employees' entitlement to retain all tips except for the amount subject to a valid pooling arrangement limited to employees who "customarily and regularly receive tips." *Id.* In addition, the defendants adequately informed the plaintiffs that the tip credit was governed by the FLSA. The statute itself, although it also requires notice, does not unambiguously require notice that notice is required. The court finds that the plaintiffs are not entitled to summary judgment on the question of whether the defendants failed to provide the notice required by § 203(m) during the post-pandemic period.

####   4.   *Exerting Improper Control Over Tips*

Next, the plaintiffs argue that the defendants violated the FLSA by implementing and engaging in a policy or practice of requiring servers to round down guest checks to the nearest dollar whenever the guests paid in cash, to the benefit of guests (and the defendants) and to the detriment of the plaintiffs, insofar as the policy required the plaintiffs to use their own tip money to pay a portion of the guest bills. That is, according to the plaintiffs, if a guest's bill is for $10.20 (or even $10.70) and the guest pays with a twenty-dollar bill, he or she would receive back $10.00 in change, rather than $9.80 (or $9.30). (*See* Doc. No. 287-9, Carlisle Dep. 28–29 (affirming his allegation that he was "trained by management to round customer change to the nearest dollar" meaning that he was required to use his "own tip money to make change for customers who paid in cash and whose bills had to be rounded [down]").) Plaintiff Crowley similarly alleges that, when he worked as a server at Virago, the defendants "would not allow [him] to give coins to customers as change" and instead required him to "round customer change to the nearest dollar." (Doc. No. 66-7, Crowley Decl. ¶ 7.) He claims that this policy " required [him] to use [his] tip money to provide change to customers who paid in cash and whose bills had to be rounded [down]." (*Id.*) During his first week of work, this policy caused him to be a dollar short at the end of the night, which he had to borrow from a bartender before he could leave the restaurant. (*Id.*)

The plaintiffs also point to testimony from Charlene Eddy, director of operations for Kayne Prime, Moto, and Virago, who stated first that she did not know what change would be given to a restaurant patron who paid in cash. (Doc. No. 287-5, at 37–38.) But, when asked if the "expectation" was that the guest would be given back $10.00 even in change on a $10.50 tab, Eddy agreed that there was an "expectation" that the change would be "rounded up to the guest's favor." (*Id.* at 38.) She also agreed that this "expectation" would be "the same across the concepts." (*Id.*). Carrie Doyle likewise testified that, for at least some period of time, Moto did not have coins on

hand, and it was generally expected that, if a guest paid a $10.50 check with a twenty-dollar bill, the guest would receive $10.00 in change. (Doyle Dep. 217–18.) She also testified that, at the end of the evening, when the server cashed out and was shown to owe the restaurant $254.16 in cash, for guests who paid in cash, the restaurant would require a payment of $254.00, not $254.16. (*Id.* at 36–37; *accord* Doyle Dep. 215 ("If [the server] owed the house $43.24. then you would say, You owe the house $43, because at that time . . . we didn't have coins.); *id.* (stating that if the server owed $43.75, the sum would still be rounded down to $43.00).)

Doyle further admitted in response to questioning from plaintiffs' counsel that, if ten different guests gave a server a twenty-dollar bill for a $10.50 tab, the server would give each guest back $10, rather than $9.50. If each guest then left a $5.00 bill to cover the tip, for a total of $50, at the end of the night, the cash out amount the server would owe the restaurant would be $52.50, and the server would be required to pay the restaurant $52.00, even though he only collected $50.00 from customers, meaning that the server "ate" $2.00 that was otherwise billed to the patron, while the restaurant "ate" 50 cents of the total. (Doyle Dep. 218–21.) In other words, according to the plaintiffs, this hypothetical server was required to hand over to the defendants $2.00 of his tips in that scenario. Doyle confirmed that, when she was at Moto, she "didn't do anything to make sure that that didn't happen to servers" and "wasn't trained to do anything to make sure that didn't happen to servers." (*Id.* at 221–22.)

Debra Johnson, in her 30(b)(6) deposition, claimed, to the contrary, that "there was change in the till" at each restaurant, and servers could "get exact change" for patrons who paid tabs in cash, if they chose. (Johnson 30(b)(6) Dep. 262–63.) Asked whether servers for any of the restaurants were "trained to or encouraged to" provide change in bills only, rounding down in patrons' favor, Johnson stated affirmatively, "No." (*Id.* at 263.) She also averred that, at the end of

the night, when servers cashed out, managers did not round tips to the nearest dollar but would provide exact change. (*Id.* at 264 ("There's . . . no policy telling anyone to round anything, whether it comes to guest money or tips.").) She further claimed that she had never heard of that happening, except insofar as the plaintiffs alleged that it happened in this lawsuit and in a previous lawsuit. Instead, she stated, based on her purported investigation into this allegation, "the expectation is that people had the exact amount of money that they were owed." (*Id.* at 265.) Jaime Sutton likewise testified that there was no "practice or policy with respect to what change [servers] give a customer paying cash." (Doc. No. 287-7, Sutton Dep. 47.) She agreed that, if a customer's tab was $10.20 and he paid with a twenty-dollar bill, she personally would expect that the customer would receive $10.00 in change, rather than $9.80, but she asserted that servers were not "instructed" to do that and that, if they asked the bartender for exact change, they would receive it. (*Id.*) Sutton also testified that every restaurant maintained at least a limited amount of change in each of their cash tills, and most of the restaurants had more than one till. (Sutton Dep. 49–50.)

Inexplicably, Johnson has now provided a Declaration in support of the defendants' Motion for Partial Summary Judgment, in which she states that, while the M Street restaurants do not have a written policy requiring tipped employees to round up in favor of patrons when providing cash change, "[i]n practice, the restaurants rounded cash change to the nearest dollar for simplicity." (Doc. No. 211-12, Jan. 27, 2023 Johnson Decl. ¶¶ 17–18.)[14]

The plaintiffs argue that the undisputed facts show that the defendants exercised unlawful control over employee tips by not permitting the plaintiffs to retain all of their tips by maintaining an "across-the-board policy that requires tipped employees to provide extra cash change to

---

[14] The court is aware that the plaintiffs' motion to strike the affidavit as "sham" (Doc. No. 240) is pending and is ruling simultaneously thereon.

customers" who pay with cash, which extra change can only come from employees' tips. (Doc. No. 204, at 23.) The defendants respond, first, that cash sales make up 4.35% of all sales at all of the restaurant concepts, meaning that cash sales rarely occur and, second, that there is no actual policy forcing servers to round up or down on a customer's tab or to use his or her own tips to make the customer's change, even if, as a practical matter, most of them engaged in rounding.

Because this issue relates to the defendants' entitlement to take a tip credit, the defendants bear the burden of proof. *See Myers v. Copper Cellar Corp.*, 192 F.3d 546, 549 n.4 (6th Cir. 1999) ("[A]n employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption."). The court finds that the defendants have produced sufficient evidence to give rise to material factual disputes as to whether the defendants implemented and imposed an actual (verbal) policy regarding rounding or whether, instead, rounding was engaged in as a matter of accepted practice for the sake of convenience; as to whether coin change was available from the tills at each restaurant if servers had wanted to provide exact change to patrons; and as to whether the rounding was always in the restaurant patrons' favor instead of being to the nearest dollar, up or down, or if this was a matter left to the individual servers' discretion.

Moreover, even accepting as true the plaintiffs' version of events, there is insufficient evidence to establish with what frequency any plaintiff was adversely affected by the policy in more than a purely *de minimis* amount or whether they were adversely affected at all, in the real world instead of a hypothetical one. Plaintiffs' counsel posed to Charlene Eddy a hypothetical involving a server with five cash-paying clients during one shift. If, to pose another hypothetical, each server had one patron per shift pay cash, and the servers rounded the cash change in the patrons' favor (by, for example, providing $10.00 change instead of $9.50 when the patrons paid

a $10.50 tab with a twenty dollar bill) but then also cashed out to the restaurant by providing the same rounded down cash sum provided by the patrons ($10.00 instead of $10.50), then the servers suffered no harm. Which of these hypotheticals is more likely? The record does not say, because there is no actual evidence in the record regarding how often each plaintiff had more than one customer in a given shift pay in cash.

The plaintiffs have not established that they are entitled to judgment as a matter of law on the question of whether the defendants improperly exercised control over their tips by imposing a "rounding" policy.

### D. Whether the Defendants Have Violated the FLSA's Overtime and Tip-Credit Provision Based on the Improper Calculation of the Overtime Rate

There is apparently no dispute that the defendants' former payroll services provider, ADP, improperly calculated the overtime rate for at least some of the plaintiffs for some period of time. The plaintiffs claim that the improper calculations *also* resulted in the defendants' claiming a greater tip credit than the maximum ($5.12) permitted by the FLSA. The defendants respond that, "although in some cases [the defendants] calculated the overtime rate for tipped employees who received the tipped straight-time hourly rate of $2.13 incorrectly (*i.e.*, an overtime rate of $3.19 instead of $5.76)," the miscalculation did not happen as frequently as the plaintiffs claim, did not affect all or even most of the plaintiffs, and, more to the point, that a miscalculation of the overtime rate does not disqualify the defendants from taking a tip credit for the relevant workweeks.

The court agrees that there is a distinction between taking an excessive tip credit and failing to properly calculate overtime, and the latter does not implicate the former. A failure to pay overtime is a violation of 29 U.S.C. § 207(a)(1), the exclusive remedy for which is set forth in § 216(b). As another district court has explained in a factually similar situation, faced with similar competing arguments:

Plaintiffs argue that a failure to pay proper overtime wages revokes an employer's right to claim the tip credit under the FLSA's tip-credit provision, § 203(m). The text of § 203(m) does not support this interpretation. The section defines what wage must be paid to tipped employees, allowing part of the wage to be comprised of "an additional amount on account of the tips" received by the employee, § 203(m)(2), that is, the tip credit. Bear in mind that this is a definitional section, defining what "wage" means for purposes of a tipped employee. Section 203(m) then provides that an employer may only claim a tip credit if a tipped employee (a) is informed that the employer intends to take the tip credit, and (b) retains all tips that the employee receives. 29 U.S.C. § 203(m). An employer's failure to meet these two requirements results in forfeiture of the tip credit—that is, the employer must pay the full minimum wage.

[The defendant] argues that § 203 "has no relation whatsoever to overtime wages or any remedies for a violation of overtime pay," so its overtime violation does not implicate § 203(m) or trigger repayment of the tip credit. Based on the text of § 203(m), . . . [the defendant] is correct. There is no textual hook on which to anchor an argument that an overtime underpayment prevents the employer from relying on the tip credit. Failure to pay overtime is just that, a failure to pay overtime, and the FLSA remedies that failure by requiring its payment plus liquidated damages. What the FLSA does not say is that a failure to pay overtime also has an impact on the tip credit.

*Starr v. Chicago Cut Steakhouse, LLC*, No. 12 C 04416, 2014 WL 12931965, at *3 (N.D. Ill. Sept. 23, 2014) (internal citations omitted); *accord Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 818–21 (N.D. Ill. 2011) (collecting cases that have "recognized the lack of any textual or contextual relationship between the tip credit provision of the FLSA and those provisions of the Act that mandate payment of minimum and overtime wages and delineate the remedies for their violation" and concluding likewise that "[n]either § 216(b) nor any other section of the Act prescribes loss of an otherwise valid tip credit as the consequence of or a remedy for a § 206 or § 207 violation").

In sum, while it is clear that the defendants will be liable to those plaintiffs whose overtime rate was miscalculated in the amount by which the calculations were incorrect plus liquidated damages, *see* 29 U.S.C. §§ 207(a)(1), 216(b), the defendants do not lose their ability to claim a tip credit for those weeks in which the overtime rates were miscalculated simply because they violated

the overtime wage provision of the FLSA. The plaintiffs are not entitled to summary judgment on this issue.

E.     **Whether Time Spent Studying or Preparing for Employment-Related Tests Is Compensable Under the FLSA**

It is undisputed that the plaintiffs underwent training sessions, on the clock, while employed by the defendants and that they were required to take and pass certain menu, beverage, and related tests as a condition of their continued employment. It is also undisputed that the plaintiffs were required to study for the tests and that such required study time is generally compensable as "work time" under the FLSA. The plaintiffs assert that any "off the clock" time they spent studying is compensable, and they "seek a ruling from the Court that their study time is compensable as a matter of law such that the factfinder need only determine how many unpaid hours Plaintiffs spent studying off-the-clock." (Doc. No. 204, at 26.) The defendants, on the other hand, contend that any "extra study time at home" in which the plaintiffs might have engaged was not required, mandated, or expected by the defendants and that the plaintiffs offer no evidence to support their claims that the defendants "knew or should have known Plaintiffs were spending hours studying for required tests off the clock without pay." (Doc. No. 246, at 21 (quoting Doc. No. 204, at 28).)

The FLSA requires employers to pay employees at least a specified minimum wage for each hour the employees are employed or "engaged in commerce," 29 U.S.C. § 206, and overtime compensation for employment in excess of forty hours in a workweek. *Id.* § 207(a)(1). The Act defines "employ" to mean "to suffer or permit to work." *Id.* § 203(g); *see also* 29 C.F.R. § 785.6. The Supreme Court has defined work to include any time "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944) (footnote omitted).

Several regulations pertain to working. Under 29 C.F.R. § 785.11, "[w]ork not requested but suffered or permitted is work time," even if such work is performed at home, *id.* § 785.12. "If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked." *Id.* § 785.12. Further, "it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed." *Id.* § 785.13. Training and studying may, under certain circumstances, be deemed compensable work. Under 29 C.F.R. § 785.27,

> [a]ttendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
>
> (a) Attendance is outside of the employee's regular working hours;
>
> (b) Attendance is in fact voluntary;
>
> (c) The course, lecture, or meeting is not directly related to the employee's job; and
>
> (d) The employee does not perform any productive work during such attendance.

In other words, the regulation suggests that attendance at meetings and training programs is presumed to be compensable *unless* the four criteria are met. Attendance is not voluntary if it is "required by the employer" or if the employee is "given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.27. However, when training "is instituted for the bona fide purpose of preparing for advancement through upgrading the employee to a higher skill, and is not intended to make the employee more efficient in his present job, the training is not considered directly related to the employee's job even though the course incidentally improves his skill in doing his regular work." *Id.* § 785.29.

Several courts have applied § 785.27 to determine whether time spent studying for training programs outside regular working hours is compensable. *See, e.g.*, *Miller v. Citizens Fin. Grp.,*

*Inc.*, No. 1:17-CV-12352-IT, 2020 WL 571627, at *3 (D. Mass. Feb. 5, 2020); *Julian v. Swift Transp. Co.*, 360 F. Supp. 3d 932, 953–54 (D. Ariz. 2018); *Wicke v. L&C Insulation, Inc.*, No. 12-CV-638-WMC, 2014 WL 2957434, at *8 (W.D. Wis. July 1, 2014). In *Julian*, the court recognized that "[t]he language of the regulation is not a perfect fit for a situation involving studying instead of attendance at a meeting or training program" but nonetheless fit well enough. 360 F. Supp. 3d at 954. The court also referenced a 2009 Department of Labor opinion letter applying the regulation to a situation involving employees who attended mandatory training programs and were also told that they had to "read and/or study selected material and be prepared to discuss this material during the next class"—in other words, the employer expected employees to spend time studying at home. DOL Opinion Letter, 2009 WL 649017, at *1 (Jan. 15, 2009). The DOL noted that the "particular circumstances" of a given case will "determine whether time spent studying for . . . training programs outside the classroom after normal work hours is compensable" and that "[t]ime spent in outside study is not compensable if the studying is not required by the employer." *Id.* at *2. Under the facts of the situation presented to it, the DOL concluded that time employees spent studying was compensable. *See id.* ("When completion of homework is a requirement of a compensable training class, however, time spent completing assignments for such training is compensable.").

On the other hand, training (and studying associated with such training) to pass tests that are required as *preconditions* of employment, as opposed to the passage of tests required to *continue* employment, is not compensable. *See Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904 (6th Cir. 2002) (holding that an "employer should [not] be penalized for allowing a potential employee to begin earning income while striving to meet certain prerequisites for the job when the employer could just as easily withhold employment until successful completion of all the job requirements").

Likewise, training for the purpose of obtaining a promotion is considered both voluntary and not directly related to an employee's current position. *Price v. Tampa Elec. Co.*, 806 F.2d 1551, 1551–52 (11th Cir. 1987) (per curiam) (an already-employed meterman seeking overtime compensation for the time he spent in home-study course to advance to a higher paying job classification was not entitled to compensation, because his employer did not require him to take the course and, had he chosen not to take the course, he would have remained a meterman with the same responsibilities and benefits).

In the present case, it is undisputed that the defendants required FOH employees to undergo training and to pass tests covering such topics as restaurant layout and processes and the details of the restaurants food and beverage menus as a condition of continued employment. It seems to be generally undisputed, at least for summary judgment purposes, that the defendants compensated the plaintiffs for time spent in formal training sessions offered by the defendants, as well as for the time spent taking the tests. However, the parties dispute whether the plaintiffs were also required to engage in additional studying at home, in order to pass the tests, for which they were not compensated.

Plaintiff Connor Crowell testified that he did "a lot of studying off the clock for the menu test," for example. (Doc. No. 287-10, Crowell Dep. 69.) He claims that his managers knew that he was studying off the clock, because they would "ask him questions on what [he] was learning each day," on "how much [he] studied," and how his "studying was going." (*Id.* at 70.) He also testified that the studying was "needed for the job." (*Id.*) He did not expressly ask for time to study on the clock, but his understanding was that, "[i]f you get hired for a job and your employer asks you to study something, you don't ask if you can study it while you're at the location." (*Id.* at 71.) Rather, "it was pretty much widely understood and kind of quietly understood" that studying at home was

required. (*Id.*) Other employees similarly testified that employees were expected to study at home, on their own time, in order to pass the tests. (*See, e.g.*, Carlisle Dep. 68–69; Doc. No. 287-7, Anderson Dep. at 56.) They do not, however, identify which managers implied that studying at home was required or knew that the employees were studying at home, nor do they adequately explain the factual basis for their assumption that studying at home was required.

In addition, Paige Christy acknowledged that some studying needed to be done to pass the various tests, but she testified that M Street's policy, as communicated by her and others to employees, was that they wanted employees to be paid for their time and that any time spent studying should be done at the restaurants and on the clock. (Christy Dep. 83–84; 86–87, 90.) Jaime Sutton testified that employees were given ample time to study for the tests while at work and clocked in. (Sutton Dep. 110.) She also stated that employees were not required to study on their own, off the clock, and, although she could not speak for other managers, she was not aware that people studied for the tests at home. (*Id.* at 112.)

Even if the court accepts as a factual matter that some plaintiffs studied for the various tests at home and were not compensated for that time, there are material factual disputes as to whether the studying was voluntary or, instead, required by the defendants and as to whether the defendants knew or had reason to believe that employees were studying at home. The plaintiffs are not entitled to summary judgment on the question of whether their study time is compensable.

## IV. THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT:

### A. Claims by Plaintiffs Who Were Not Subject to a Tip Credit

The plaintiffs, as indicated above, agree that any claims related to the FLSA's tip credit provisions arising from the time period when the restaurants paid higher wages and did not take a tip credit are subject to dismissal. In addition, the plaintiffs more generally agree that any opt-in plaintiffs for whom the defendants never claimed a tip credit—for instance, those who never made

it past their training period, during which they were paid minimum wage—do not have valid claims based on the FLSA's tip-credit requirements. (*See* Doc. No. 242, at 2 ("Plaintiffs agree that Opt-in Plaintiffs for whom Defendants never claimed a tip credit do not have claims that depend on the FLSA's tip-credit requirements and have offered to enter a stipulation on this issue.").)[15] The defendants are entitled to summary judgment on these particular claims.[16]

The defendants also assert, without any actual argument or analysis, that all of the claims brought by any plaintiffs who were never paid less than minimum wage (those plaintiffs identified in the defendants' Exhibits Y and AA, Doc. Nos. 211-16, 212-1) should be dismissed. (*See* Doc. No. 214, at 9–10.) The plaintiffs oppose that portion of the defendants' motion.

As the plaintiffs point out, not all of the plaintiffs' claims are premised upon violations of the FLSA's tip credit provisions, including claims that they were not paid for time (or overtime) spent studying for mandatory tests and that the defendants improperly shifted certain business expenses to them. The defendant has not addressed these claims as brought by plaintiffs who fall within the definition of the collective but were otherwise never paid less than the minimum wage. The defendants are not entitled to summary judgment on these particular claims.

### B.     Whether the Defendants Included Non-Tipped Employees in Tip Pooling

As discussed above, the FLSA requires employers to pay employees a minimum wage—currently set at $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). The FLSA contains an exception that permits employers to pay tipped employees less than the minimum wage—no less than $2.13 per hour—when the tipped employees' tips make up the difference between that amount and the

---

[15] The plaintiffs actually assert that they have never sought tip credit damages for workweeks when the defendants did not claim a tip credit. (Doc. No. 242, at 15.)

[16] The plaintiffs who never received less than minimum wage were apparently not subject to, and would not have claims arising from, the defendants' overtime-rate miscalculations that were mistakenly based on 1.5 times the tipped wage rather than the standard minimum wage.

minimum wage. *Id.* § 203(m). As also discussed above, the employer's discount is called the "tip credit." *See id.* § 203(m)(2)(B); *U.S. Dep't of Lab. v. Cole Enters.*, 62 F.3d 775, 780 (6th Cir. 1995).

To claim a tip credit, however, employers must, among other things, ensure that "all tips received by [a tipped] employee have been retained by the employee," except that a tip pooling arrangement "among employees who customarily and regularly receive tips" is permissible. 29 U.S.C. § 203(m)(2)(A); *see also* 29 C.F.R. § 531.59(b) ("With the exception of tips contributed to a tip pool limited to employees who customarily and regularly receive tips . . . , section 3(m)(2)(A) also requires employers that take a tip credit to permit employees to retain all tips received by the employee."). If an employer fails to strictly comply with § 203(m)'s requirements, it "must be divested of its statutory tip credit for the relevant time period." *Steele v. Leasing Enters.*, 826 F.3d 237, 246 (5th Cir. 2016); *see also Myers v. Copper Cellar Corp.*, 192 F.3d 546, 550–51 (6th Cir. 1999) (holding that employees illegally forced to share tips with employees in a non-tipped position are "entitled to repayment of the full . . . minimum wage for all work time logged during those shifts").

Generally, an employee "customarily and regularly receive[s] tips" if she is "[e]ngaged in a tipped occupation" performing either "tip-producing work" or "[w]ork that directly supports the tip-producing work, if the directly supporting work is not performed for a substantial amount[17] of time" 29 C.F.R. § 531.56(f)(1). Tip-producing work is "any work performed by a tipped employee that provides service to customers for which the tipped employee receives tips." *Id.* § 531.56(f)(2)(i). The regulation provides the following "illustrative" but "not exhaustive"

---

[17] A "substantial amount" of time is defined as more than twenty percent in a workweek or more than thirty minutes continuously. 29 C.F.R. § 531.56(f)(4).

examples of tip producing work:

> A server's tip-producing work includes providing table service, such as taking orders, making recommendations, and serving food and drink. A bartender's tip-producing work includes making and serving drinks, talking to customers at the bar and, if the bar includes food service, serving food to customers. . . . A busser's tip-producing work includes assisting servers with their tip-producing work for customers, such as table service, including filling water glasses, clearing dishes from tables, fetching and delivering items to and from tables, and bussing tables, including changing linens and setting tables. . . . The tip-producing work of a tipped employee who both prepares and serves food to customers, such as a counterperson, includes preparing and serving food.

*Id.* § 531.56(f)(2)(ii).

The Sixth Circuit has held that restaurant hosts were "engaged in an occupation for which [they] customarily and regularly receive[] . . . tips" and thus properly part of a tip-pool,

> because they sufficiently interact with customers in an industry (restaurant) where undesignated tips are common. Although the parties dispute exactly how hosts spend their time working . . . , hosts do perform important customer service functions: they greet customers, supply them with menus, seat them at tables, and occasionally "enhance the wait." Like bus persons, . . . hosts are not the primary customer contact but they do have more than *de minimis* interaction with the customers. One can distinguish hosts from restaurant employees like dishwashers, cooks, or off-hour employees like an overnight janitor who do not directly relate with customers at all.

*Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998). Conversely, salad preparers who "abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work" were not validly categorized as "tipped employees." *Myers*, 192 F.3d at 550.

The plaintiffs expressly allege in the FAC that the defendants have a policy of requiring servers to "share tips with non-tipped employees," that is, employees who do not typically interact with customers and, consequently, do not "customarily and regularly receive tips," including "bar backs." (FAC ¶ 115.) The defendants now move for summary judgment on that claim, on the basis

that the undisputed facts establish that that tip-pooling arrangements that included barbacks and "captains" were not improper. In response, the plaintiffs do not refute the contention that tip-pooling with captains was appropriate, but they maintain that barbacks were improperly included in the tip pools and, further, that the defendants have not addressed their claim that silverware rollers were also improperly included in tip pools.

*1.*     *Whether Barbacks Are Properly Classified As Tipped Employees*

Regarding barbacks, the defendants rely on two DOL publications: (1) DOL Wage and Hour Division Opinion Letter FLSA2009-12 (Jan. 15, 2009);[18] and (2) the DOL Field Operations Handbook § 30d04(b)(7) (which itself references FLSA2009-12).[19] Section 30d04(b) lists a number of occupations that "have been recognized as those in which employees customarily and regularly receive tips," including

> [b]artender assistants or barbacks, who are similar to bussers because they learn bartending under the tutelage of a bartender, have the primary duty of supporting the bartender, and receive their tips from the bartender. Barbacks work primarily in the bar area and have the opportunity to occasionally interact with customers.

*Id.* § 30d04(b)(7).

FLSA2009-12 responded to a request for an opinion as to whether barbacks qualify as tipped employees. The occupation of "barback" was described as follows in the opinion letter:

> You . . . state that the term "barback" refers to a bartender's assistant who learns the profession of bartending under the tutelage of a bartender and whose primary job duty is to support the bartender. The barback typically works the same hours as the bartender and is responsible for restocking the bar and ensuring that the bar area remains clean and organized. You indicate that the barback may also bus the service counter, clean empty glasses sitting on the bar, take out the trash from behind the bar and clean the floor of the bar area. You state that the barback works primarily in the bar area, in front of and around customers, and has the opportunity to

---

[18] Available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2009_01_15_12_FLSA.pdf.

[19] Available at https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-30#B30d04.

occasionally interact with customers.

FLSA2009-12, at 1. Based on this description, the DOL concluded that barbacks would qualify for participation in a tip pooling arrangement. The opinion is "based exclusively on the facts and circumstances described in your request." *Id.* at 3.

In this case, arguing that barbacks were appropriately included in tip-pooling arrangements, the defendants point to Jaime Sutton's testimony that, in the restaurants that employed them, barbacks' jobs required them primarily to "restock beer, restock liquor, restock silverware, plates, [re]fill [guests' water glasses], restock chips." (Sutton Dep. 100–01.) In addition, they would occasionally clear plates for guests who dined at the bar or "take something" if a guest asked them to. (*Id.* at 101.) Sutton agreed that filling guest water glasses and clearing plates was not something barbacks typically did and that the focus of their job was to support the bartender, but that they "occasionally" had customer contact. (*Id.* at 102.) Plaintiff Phoenix Moore, who worked for a period of time as a barback, testified that barbacks differed from bussers in that the former only "occasionally" interacted with customers while bussers were "much more involved in the entire experience," as they "talked to customers and bussed and ran food." (Doc. No. 287-13, Moore Dep. 17–18.)

While agency interpretations of the law, such as those contained in opinion letters and the Field Operations Handbook, are not binding authority, they have "persuasive value" when "well considered and well reasoned." *Fazekas v. Cleveland Clinic Found Health Care Ventures*, 204 F.3d 673, 677 (6th Cir. 2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (noting that agency interpretations are "'entitled to respect' . . . to the extent that those interpretations have the 'power to persuade'" (quoting *Skidmore*, 323 U.S. at 140)). This court finds the agency interpretations referenced above to be persuasive, as they are consistent with the examples of tipped worked set forth in 29 C.F.R.

§ 531.56(f)(2) and, moreover, with the Sixth Circuit's rulings in *Kilgore* and *Myers*. Based on that authority, the court finds that barbacks' "occasional" contact with customers while providing support for bartenders directly engaged in serving customers, as described by Sutton and Moore, would be sufficient to make the defendants' barbacks—similar to bussers—qualify for participation in a tip pool.

The defendants' evidence, however, is refuted by that of the plaintiffs, many of whom have stated in interrogatory answers or depositions (or both) that they were required to share tips with barbacks and that barbacks, contrary to Sutton's testimony, did not have *any* customer interaction. (*See, e.g.*, Doc. No. 243-6, at 4, 10, 16–17, 25; Doc. No. 243-7, at 7, 15, 23.) Because there is a material factual dispute as to whether barbacks had any customer interaction at all, which appears to be a minimum requirement for qualification as a tipped employee, the defendants are not entitled to summary judgment on the issue of whether requiring servers and bartenders to share tips with barbacks violated the tip-credit provisions of the FLSA.

> 2.    *Whether the Plaintiffs Were Required To Share Tips with Silverware Rollers*

The plaintiffs have also presented evidence in the form of their own testimony that they were required to share tips on occasion with silverware rollers, who, during certain shifts at least, had no customer contact or interaction and were solely engaged in rolling silverware. (*See, e.g.*, Doc. No. 243-8, at 4–5 (plaintiff Raegan Maxwell's interrogatory answer stating "Plaintiff was required to participate in a tip pooling arrangement that included . . . silverware rollers. [S]ilverware rollers did not interact with customers. In fact, Plaintiff recalls silverware rollers were required to roll silverware in a back-of-house closet. The only job of a silverware roller was to roll silverware."); *id.* at 13 (plaintiff Thomas Bragg's similar interrogatory answer).)

The defendants deny that any tip-sharing arrangement included silverware rollers, pointing to their written Compensation Structures (Doc. No. 213-1) detailing which employees participated in the tip pools at each restaurant. The court notes, however, that the Compensation Structures only cover the time period from April 2021 forward, that the defendants have not even provided a declaration regarding the classification of silverware rollers during the pre-pandemic time period (March 2020 and earlier), and that at least one employee indicated that, for some shifts, he was classified as a server assistant (a category of job that participated in the tip pool) but worked solely as a silverware roller. (See Moore Dep. 12, 18–19.) The plaintiffs have successfully established the existence of a material factual dispute as to whether silverware rollers participated in tip pools for some period of time.

In short, the defendants are not entitled to judgment as a matter of law on the question of whether they ever improperly included non-tipped employees in the tip pool distributions at any of the restaurants.

### C. Whether the Defendants Unlawfully Retained Any Portion of Gratuities Included as Part of Customers' Bills for Large Parties and Private Events

The defendants maintain that the plaintiffs have also alleged that the defendants unlawfully retain a portion of the gratuity included on customers' bills for large parties or private events. The defendants seek partial summary judgment on this issue. It is undisputed that, for large parties or private events, the defendants impose on the customer a 22% fee, which is detailed in the contract with the customer. Of the 22% service charge, 18% is designated as a tip and distributed to the servers and bartenders working the event, while the remaining 4% is designated as a service charge and distributed to the administrative staff that helped schedule, facilitate, and set up the event. (Doc. No. 243 Resp. ¶¶ 54, 55.) Citing 29 C.F.R. § 531.55, the defendants argue that, under the FLSA, the 4% service charge is not a tip. *See* 29 C.F.R. § 531.55(a) ("A compulsory charge for

service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of sections 3(m)(2)(A) . . . .").

The plaintiffs have not responded to this argument other than by stating, in their Response to the defendants' SUMF, that they "do not assert any claims based on Defendants' pay practices for large parties and events." (Doc. No. 243, Resp. SUMF ¶¶ 54, 55.)

Insofar as at least some plaintiffs have alleged the wrongful withholding of tips associated with large parties, the defendants are entitled to summary judgment on this issue.

### D.    Whether the Defendants Acted Willfully

The FLSA contains a two-year statute of limitations, which is extended to three years if a plaintiff proves that the defendant willfully violated the FLSA. 29 U.S.C. § 255(a). A violation of the FLSA is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The plaintiff has the burden of proving willfulness. *Id.* at 135.

An employer who merely acts negligently, or even unreasonably, cannot be deemed to have acted willfully. *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 841 n.5 (6th Cir. 2002). Rather, the Sixth Circuit has found an employer to have acted knowingly or recklessly when it "had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA." *Walsh v. KDE Equine, LLC*, 56 F. 4th 409, 414–15 (6th Cir. 2022) (quoting *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 473–74 (6th Cir. 1999); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991)). When, for example, the defendant has been put on notice of potential FLSA violations by a previous lawsuit and continues to engage in the same conduct without investigation into the allegations, a reasonable jury could find that the defendant's conduct is

willful. *See, e.g.*, *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (upholding a district court's finding of willfulness where the employer was notified by a government representative that its payment practices violated the FLSA, and the employer continued those practices without further investigation); *King v. Premier Fire Alarms & Integration Sys.*, *Installation Div., Inc.*, No. 20-60064-CIV, 2021 WL 7540775, at *2 (S.D. Fla. Dec. 1, 2021) ("Courts have found willful violations where the evidence showed . . . earlier violations of the FLSA that would put the employer on actual notice of the requirements of the FLSA[.]" (citations omitted)); *Brooks v. Tire Discounters, Inc.*, No. 3:16-cv-02269, 2018 WL 1243444, at *8 (M.D. Tenn. Mar. 8, 2018) (Trauger, J.) ("[C]ourts within the Sixth Circuit have generally found the willfulness standard met where there is evidence in the record that the employer actually knew that its conduct violated the FLSA or was placed on notice that its conduct might violate the statute, whether by prior Department of Labor investigations, by prior complaints or lawsuits brought by employees, or otherwise." (collecting cases). However, the allegations in the previous lawsuit must be sufficiently similar and related to those in the present lawsuit to have actually placed the defendant on notice that the same conduct alleged in the present lawsuit is unlawful. *Accord Beck v. Zanesville Police Dep't*, No. 2:10-CV-886, 2016 WL 497522, at *3 (S.D. Ohio Feb. 9, 2016) (finding that a prior lawsuit was not evidence of willfulness where the prior lawsuit did not relate to unpaid overtime compensation and was not brought under the FLSA); *Byrd v. ABC Prof'l Tree Serv., Inc.*, 832 F. Supp. 2d 917, 921 (M.D. Tenn. 2011) (Trauger, J.) (observing that "the precise factual circumstances surrounding the violations" do not need to be "substantially similar" but that a previous investigation or violation involving overtime pay is relevant to show the defendant had "actual notice of the [overtime] requirements of the FLSA.").

In this case, cutting through the myriad factual disputes regarding whether the defendants' alleged practices violated the FLSA, the sole question now before the court is whether the plaintiff has offered sufficient evidence of willfulness to avoid summary judgment on that issue. The plaintiffs' primary evidence of willfulness is the fact that the defendants were sued in a previous lawsuit alleging similar facts and asserting similar claims, *Fenwick v. M Street Entertainment, LLC*, 3:20-cv-00403, filed in this district on May 13, 2020. (*Fenwick* Doc. No. 1.) Although that lawsuit was settled approximately ten months after it was filed, without an admission of liability on the part of the defendants, *see id.* (*Fenwick* Doc. Nos. 97-1 (Mar. 5, 2021) (Settlement Agreement), 101 (Mar. 9, 2021) (Order approving Settlement Agreement and dismissing case)), other documents filed in that case establish the similarities between that case and this case.

For instance, the Complaint in Fenwick was filed by tipped employees at the M Street restaurants, who, like the plaintiffs here, alleged that the defendants "retain tips belonging to tipped employees by improperly rounding up to the nearest dollar amount the tipped employees owe to the restaurants at the end of a shift" and that the defendants fail

> to satisfy the requirements for utilizing the tip credit to meet their minimum-wage and overtime obligations to their tipped employees by: (1) retaining a portion of tips earned by their employees each shift; (2) shifting business expenses to tipped employees by requiring them to purchase uniforms and equipment; (3) requiring tipped employees to share tips with non-tipped employees who have no customer interaction [including barbacks]; (4) requiring tipped employees to perform compensable work without compensation; and (5) requiring tipped employees to spend more than 20% of their shifts performing non-tip-producing work while paid at the lower, tipped hourly rate.

*Id.*, Complaint (*Fenwick* Doc. No. 1 ¶ 3) (M.D. Tenn. May 13, 2020); *see also* Proposed Notice of Pending FLSA Lawsuit (*Fenwick* Doc. No. 35-1, at 2) (M.D. Tenn. July 9, 2020); Initial Case Management Order (*Fenwick* Doc. No. 39, at 2) (M.D. Tenn. July 20, 2020). In addition, it is undisputed for summary judgment purposes that counsel for the Fenwick plaintiffs notified defendants in December 2020 that they had been failing to pay overtime at the appropriate rate.

(*See* Doc. No. 266, Defs.' Resp. to Pls.' SAMF ¶ 105.) As set forth above, the Complaint and FAC in this case allege that the same defendants, among other things, (1) failed to satisfy the requirements for utilizing the tip credit provisions of the FLSA to meet their minimum wage and overtime obligations, as a result of which the defendants are disqualified from claiming a tip credit; (2) required the plaintiffs to work off the clock by requiring them to study for menu tests and attend meetings; (3) required the plaintiffs to pay out of pocket for "tools of the trade," including uniforms and equipment; (4) required tipped employees to spend more than 20% of each shift on non-tip-producing work while paying them less than the required minimum wage of $7.25 for the time spent doing that work; and (5) improperly calculated overtime pay. (FAC ¶¶ 3, 5, 82.) Although the defendants characterize *Fenwick* as simply pleading "a cause of action for alleged underpaid overtime (as do most FLSA complaints)" (Doc. No. 214, at 15), implying that the allegations were not specific enough to notify the defendants what the plaintiffs believed they were doing wrong, the allegations in the pleadings alone establish that the overlap—while not complete—is substantial.

The defendants nonetheless argue that *Fenwick* is not relevant to the issue of willfulness, because it was "settled in the early stages and there was no discovery process and no certification hearing." (Doc. No. 214, at 15) They claim that their attorneys "conducted a cursory overview of the case and evaluated what exposure might be involved," without performing any "searching inquiries or research," and "quickly [decided] to resolve the matter before significant attorneys' fees were incurred." (*Id.* (citing Doc. No. 222-14, Cook Decl. ¶¶ 3–6).) The plaintiffs dispute the contentions that *Fenwick* was "not litigated" and that the case was resolved prior to discovery. *See* Pls.' Mem. Supp. Unopposed Motion for Approval of Settlement Agreement (*Fenwick* Doc. No. 98, at 2–3 (M.D. Tenn. Mar. 5, 2021)) (detailing the volume of discovery conducted prior to and

during settlement negotiations).

The court finds that any dispute about the amount of discovery conducted and the degree to which *Fenwick* was litigated is not material. The prior lawsuit at least arguably put the defendants on notice of specific potential violations of the FLSA. A reasonable jury could find, based on the defendants' own representations, that the defendants were reckless in failing to conduct a reasonable investigation into the allegations in *Fenwick*. Moreover, if the defendants are found liable in this case for substantive violations involving requiring tipped employees to perform large volumes of non-tip producing work at the tipped wage, requiring employees to work off the clock without pay, shifting business expenses to employees, and failing to notify tipped employees that they were taking the tip credit, and the jury also finds that the defendants continued to engage in these violations after having the opportunity to investigate the claims made in *Fenwick*, the same jury could find that the defendants acted knowingly or recklessly for purposes of extending the statute of limitations under § 255.

The defendants, in short, are not entitled to summary judgment on the question of willfulness.

## V.     CONCLUSION

For the reasons set forth herein, the defendants' Motion for Partial Summary Judgment (Doc. No. 208) will be granted in part and denied in part. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge